**POTTER HANDY LLP**
James M. Treglio (SBN 228077)
classactions@potterhandy.com
100 Pine St., Ste 1250
San Francisco, CA 94111
(415) 534-1911
Fax: (888) 422-5191

Attorneys for Plaintiffs, on behalf of themselves and all others similarly situated

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **K.C., M.T.,** and **M.S.,** individually and on behalf of themselves all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**SALESFORCE, INC. (f/k/a Salesforce.com, Inc.),** a Delaware Corporation with its principal place of business in California,<br><br>Defendants. | CASE NO.<br><br>**CLASS COMPLAINT FOR VIOLATIONS OF:**<br><br>**(1) Violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595**<br>**(2) Violation of the Child Abuse Victims' Rights Act, 18 U.S.C. § 2255 ("CAVRA")**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs K.C., M.T., M.S., ("Plaintiffs"), individually and on behalf of the proposed Class and Minor Subclass defined herein, brings this Class Action Complaint against Defendant Salesforce, Inc. ("Salesforce"), and alleges as follows upon personal knowledge as to themselves and their own acts, and upon information and belief, the investigation of counsel, and publicly available information as to all other matters:

## INTRODUCTION

**1.** Backpage.com ("Backpage") was, in the words of the United States Congressional Report, an enterprise engaged in the "knowing facilitation of online sex trafficking." Between 2008 and 2011, Backpage became publicly identified by law enforcement as the biggest and most notorious sex trafficking and pimping website in the United States. Between 2013 and 2015 alone, more than ninety-nine percent of Backpage's revenue came from its adult advertising section. Backpage pleaded guilty to human trafficking, its chief executive was charged with pimping a minor; and its principals invoked the Fifth Amendment before the United States Senate. In April 2018, the federal government seized Backpage.

**2.** Backpage did not build that enterprise alone. For four and a half years—from November 2013 until the federal seizure in April 2018—Backpage's growth was underwritten by Salesforce, the world's largest provider of customer relationship management ("CRM") software.

**3.** Salesforce was not an arms-length vendor that shipped a boxed product and walked away. Salesforce assigned Backpage a succession of dedicated account executives. It escalated the Backpage account to regional managers, area vice presidents, and a vice president of commercial sales. It offered Backpage discounts, subsidies, and "investment funds." It supplied solution engineers, success managers, and marketing specialists. It repeatedly asked Backpage about its "business objectives," its "operational needs," and its "growth plans," and then designed targeted solutions to meet them. It requested and received login credentials to Backpage's confidential customer database. It helped Backpage build the marketing machinery that acquired and retained the customers who bought the advertisements. And when Backpage set out to move its operations to Amsterdam and place its data beyond the reach of American law enforcement, Salesforce cloned Backpage's system and migrated its data.

**4.** Salesforce did all of this while Backpage was among the most widely reported criminal enterprises in the country. From the time Backpage first contacted Salesforce in 2012, Backpage was well known as a site on which human beings were bought and sold. Salesforce's own hometown newspaper published hundreds of articles about Backpage. Fifty-one state attorneys general publicly demanded that Backpage stop facilitating "human trafficking, especially the trafficking of minors." The New York Times told the story of a sixteen-year-old sold on the site. The United States Senate opened an investigation, held Backpage in contempt, and published its findings. Backpage's CEO was arrested on child sex-trafficking charges in 2016—and weeks later signed another Salesforce contract renewal. A Salesforce solution engineer, discussing whether Backpage would hire an outside consultant, wrote: "Given the nature of their business, I'm not sure they would engage a partner."

**5.** Salesforce earned $1,469,846.02 from the Backpage relationship.

**6.** The Seventh Circuit has already held that these facts state a claim. *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023). On remand, the United States District Court for the Northern District of Illinois held that they state a claim again. *G.G. v. Salesforce, Inc.*, No. 20 C 2335, Dkt. 327 (N.D. Ill. Jan. 7, 2026) (Kendall, C.J.).

**7.** What has never been adjudicated is the scale of the harm. Backpage had approximately 6.5 million users. According to the Senate's investigation, seventy-three percent of all suspected child sex-trafficking reports the National Center for Missing and Exploited Children received from the public involved Backpage. Plaintiffs K.C., M.T., and M.S., are ones of thousands of people who were advertised for commercial sex on Backpage as minors during the years Salesforce was helping Backpage grow.

**8.** The elements of Salesforce's liability do not vary from victim to victim. Whether Salesforce participated in Backpage's venture, whether Salesforce knew or should have known that the venture violated 18 U.S.C. § 1591, and whether Salesforce knowingly benefited from that participation are questions about Salesforce's conduct alone. The Seventh Circuit has squarely held that a plaintiff proceeding under 18 U.S.C. § 1595 needs to allege plausibly that the defendant had constructive knowledge that a venture *generally* has violated Section 1591, and that knowledge of

the specific victim, let alone knowledge of her identity, is not required. *G.G.*, 76 F.4th at 558. This case is therefore uncommonly well suited to class treatment: liability is common, and only victim status and damages are individual.

**9.** Plaintiffs bring this action under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595, and under the Child Abuse Victims' Rights Act ("CAVRA"), 18 U.S.C. § 2255.

## JURISDICTION, SERVICE OF PROCESS, AND VENUE

### Subject Matter Jurisdiction

**10.** This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States—specifically, 18 U.S.C. § 1595 and 18 U.S.C. § 2255.

**11.** This Court independently has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the proposed Class contains more than 100 members, the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, and at least one member of the proposed Class is a citizen of a State different from Salesforce, which is a citizen of Delaware and California.

### Personal Jurisdiction

**12.** This Court has general personal jurisdiction over Salesforce because Salesforce maintains its principal place of business in San Francisco, California, within this District, and is therefore at home in this State. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (identifying a corporation's place of incorporation and principal place of business as the paradigm bases for general jurisdiction).

**13.** Count II of this Complaint arises under 18 U.S.C. § 2255, which authorizes service of process on a defendant outside the boundaries of the forum State. Where a federal statute authorizes such service, Federal Rule of Civil Procedure 4(k)(1)(C) makes service effective to establish personal jurisdiction, and the constitutional inquiry is governed by the Fifth Amendment: the question is whether the defendant has sufficient contacts with the United States as a whole.

Salesforce is a United States corporation, organized under the laws of Delaware, headquartered in California, and doing business in all fifty States.

**14.** Its contacts with the United States are overwhelming, and the exercise of jurisdiction over it in this District offends no notion of fair play or substantial justice. This Court accordingly has personal jurisdiction over Salesforce as to Count II, and may exercise pendent personal jurisdiction over Count I, which arises from the same common nucleus of operative fact.

**Venue**

**15.** Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Salesforce, the sole defendant, resides in this District within the meaning of 28 U.S.C. § 1391(c)(2) and (d). Salesforce maintains its principal place of business in San Francisco, California, and is subject to personal jurisdiction in this District.

## PARTIES

**16.** **Plaintiff K.C.** is a natural person who, while a minor, was a victim of sex trafficking within the meaning of 22 U.S.C. § 7102 and 18 U.S.C. § 1591(a), and who is therefore entitled to bring a civil action under 18 U.S.C. § 1595 and 18 U.S.C. § 2255. K.C. proceeds by initials given the deeply personal and sensitive nature of these allegations, and moves contemporaneously for leave to proceed by pseudonym and for entry of a protective order.

**17.** K.C. was trafficked for commercial sex from approximately the summer of 2014 through approximately the summer of 2015, when she was fourteen and fifteen years old. She was introduced to her trafficker through an acquaintance at her high school. He feigned romantic interest in her, created and then exploited a chemical dependency, and used physical violence and threats of violence to compel her to perform commercial sex acts. He controlled her movements, spoke for her, and kept her earnings. K.C. was advertised, offered, and solicited for commercial sex on Backpage.com throughout that period.

**18.** K.C. was introduced to her trafficker by an acquaintance in high school. He pretended to be romantically interested in her but quickly trapped her by getting K.C. addicted to drugs. Once she was dependent, K.C.'s trafficker began forcing her to have sex with men. From the summer of 2014, when she was fourteen, until the summer of 2015, when she was fifteen, K.C.

was trafficked through Backpage ads and sold out of hotels, where staff could clearly see she was a minor.

**19.** The Backpage postings included K.C.'s photos, prices, and contact information, making it easy for buyers to arrange encounters. Her childlike features, such as a chubby face and clumsy walk, made it clear K.C. was a minor, yet the ads remained online. Men who responded to the postings could easily tell she was underage, but they still proceeded with encounters facilitated entirely through the website.

**20.** K.C. recalls that her trafficker relied on Backpage as the central tool for her exploitation. K.C.'s trafficker kept all of her earnings, kept her high on drugs, and used the website as a marketplace to sell her daily. The constant stream of adult men responding to the ads left K.C. with no rest, and she was always fearful and visibly under the influence of substances.

**21.** Despite the use of drugs, K.C. recalls that her trafficker forced her to take photos and told her that these were for Backpage. On Backpage post, which she saw, there were at least three photos of her; in all of them, she was wearing short shorts and a tiny shirt. K.C.'s face was not showing in any of the photos because he took them from the neck down. K.C. is informed and believes that the trafficker used the name "Snowwhite," for her ads.

**22.** From the start, it was clear to staff at the hotels that K.C. was a minor. She had childlike features, walked in a clumsy, youthful way, and was always accompanied by her trafficker, a grown man with tattoos. K.C. appeared fearful and very high on substances. Staff could clearly see that she was not there willingly, yet they did not care or offer her help in any way.

**23.** K.C. was trafficked at many locations, but she remembers most clearly the Motel 6 Orlando – International Drive (5909 American Way, Orlando, FL 32819) and Motel 6 Altamonte Springs (235 Wymore Rd, Altamonte Springs, FL 32714). These hotels became central places where her trafficker sold her to adult men.

**24.** At Motel 6 Orlando, K.C. recalls her trafficker walking up to men in the lobby and offering her for sex. He would ask if they were "looking to have fun with a girl," forcing her to stand beside him, looking down and not allowed to speak. Sometimes he made K.C. spin so men

could look at her. The front desk staff, a Hispanic man and woman in their 30s, clearly saw this but ignored it, even though K.C. was a minor dressed in revealing clothes and surrounded by adult men.

**25.** At the same location, K.C. recalls an incident when she was 15 years old. Her trafficker screamed violently at her outside the front desk because she was tired and wanted to rest. He locked her out of the room, leaving her outside for hours. K.C. cried, her makeup smeared, and she waited in the parking lot visibly upset. A Hispanic housekeeping woman and a Hispanic gardener both saw her distress but ignored her situation and offered no assistance.

**26.** On another occasion at Motel 6 Orlando, K.C.'s trafficker beat her very badly inside her room because she had not made the amount of money he demanded. K.C. screamed loudly during the beating. Her room was near the front desk, and the staff could clearly hear her cries, yet nobody checked. This incident shows that staff ignored her safety even when she was in obvious danger.

**27.** At both locations, housekeeping staff saw clear signs of trafficking. They saw condoms, lubricant, and constant foot traffic of adult men entering K.C.'s room. On multiple occasions, K.C. was forced to ask housekeeping for towels while visibly high, her eyes half-closed, her speech slurred, and her demeanor fearful. Staff ignored these signs and continued to serve the trafficker.

**28.** K.C.'s trafficker was eventually arrested in a sting operation in Seminole County, Florida, and charged with solicitation of a minor. The FBI investigated the case, and K.C. was named in the investigation (Case No. 6:15-CR-254). She has been in contact with the FBI Regional Office in Orlando, Florida, regarding the request for records. When she was rescued, she was so heavily drugged that she had to be sent to a facility for 72 hours to stabilize. As a direct result of being trafficked as a minor, K.C. now suffers from severe anxiety and PTSD, with lasting psychological harm that continues to affect her daily life.

**29.** The person who trafficked K.C., Rowy De Jesus Vasquez, was arrested in June 2015 in a human trafficking operation conducted out of the Motel 6 at 235 Wymore Rd, Altamonte Springs, FL. The trafficker was prosecuted federally in the U.S. District Court for the Middle District of Florida (*USA v. Rowy De Jesus Vasquez*, Case No. 6:15-cr-00254) and was convicted

and sentenced to 360 months (30 years) in federal prison, followed by 20 years of supervised release. The trafficker is currently incarcerated at FCI Bennettsville (Register No. 63784-018) with a projected release date in 2042.

**30.** Plaintiff K.C. does not allege, and is not required to allege, that Salesforce knew of her individually, knew her name, or knew of the advertisements by which she was sold. *G.G.*, 76 F.4th at 558.

**31.** **Plaintiff M.T.** is a natural person who, while a minor, was a victim of sex trafficking within the meaning of 22 U.S.C. § 7102 and 18 U.S.C. § 1591(a), and who is therefore entitled to bring a civil action under 18 U.S.C. § 1595 and 18 U.S.C. § 2255. K.C. proceeds by initials given the deeply personal and sensitive nature of these allegations and moves contemporaneously for leave to proceed by pseudonym and for entry of a protective order.

**32.** Plaintiff M.T. was recruited into commercial sex trafficking at the age of 13 by an individual named Jason Dowell and his associate, Dorian Brown, after being introduced to him through her sister. Shortly after they met, Dowell told M.T. that she could make a substantial amount of money working for him. Relying on his representations and influence, M.T. became involved in commercial sex activity under Dowell's control. M.T. recalls that Dowell directed and managed her commercial sex activities during the trafficking period, which lasted from approximately September 4, 2012, through September 4, 2016.

**33.** During the trafficking period, Dowell advertised M.T. on Backpage.com to solicit commercial sex buyers. M.T. recalls that she did not use any alias names in connection with the advertisements. Dowell controlled the advertising process and, together with members of his team, took photographs of M.T. that were used in advertisements posted on Backpage. These advertisements enabled commercial sex buyers to locate and purchase commercial sex acts from M.T., who was 13 or 14 at the time. M.T. recalls that Backpage advertisements were regularly used to promote her and facilitate commercial sex transactions throughout her exploitation. The sex acts all occurred at hotels within State of Ohio, primarily at the La Quinta Inn & Suites by Wyndham Cleveland Airport North, located at 4222 West 150th Street, Cleveland, Ohio 44135.

**34.** Dowell arranged appointments with buyers and transported M.T., who again, was 14 or 15 years old at the time, to hotels and other locations where commercial sex acts occurred. M.T. did not independently arrange these encounters and instead relied on Dowell for transportation and scheduling. M.T. recalls that money received from buyers was split between herself and Dowell. During this period, M.T. was also exposed to and used marijuana and cocaine. Because of the significant trauma she experienced, Plaintiff has difficulty recalling certain details of her trafficking. Indeed, the trauma was so great that M.T.'s treating therapist advised her to suppress or compartmentalize traumatic memories as a coping mechanism, which has affected her ability to remember all events with specificity.

**35.** M.T. ultimately exited the trafficking situation as a result of law enforcement intervention. According to M.T., authorities were conducting an ongoing investigation into the trafficking operation, and the hotel room associated with the trafficking activity was raided by law enforcement.

**36.** M.T. further reports that she previously provided information regarding her trafficking experience to a human trafficking task force and believes additional records may exist documenting her victimization and the trafficking enterprise which contain the links as it was also published in the media. Based on her recollection, Backpage played a significant role in facilitating her trafficking because Dowell used the platform to advertise her for commercial sex, connect with buyers, and generate commercial sex transactions throughout the period of her exploitation.

**37.** As a direct and proximate result of the trafficking she endured as a minor, Plaintiff suffered exploitation, emotional trauma, psychological injury, loss of personal autonomy, and other damages. These harms have continued to affect Plaintiff long after

**38.** The trafficking ended. Plaintiff reports that she is currently sober, resides independently, and is no longer engaged in commercial sex activity.

**39.** The two traffickers who trafficked M.T. were tried and convicted in the Cuyahoga County Court of Common Pleas (*State v. Brown*, Case No. CR-15-601007 and Case No. CR-16-611487) and are serving long prison sentences.

**40.** Plaintiff M.T. does not allege, and is not required to allege, that Salesforce knew of her individually, knew her name, or knew of the particular advertisements by which she was sold. *G.G.*, 76 F.4th at 558.

**41.** **Plaintiff M.S.** is a natural person who, while a minor, was a victim of sex trafficking within the meaning of 22 U.S.C. § 7102 and 18 U.S.C. § 1591(a), and who is therefore entitled to bring a civil action under 18 U.S.C. § 1595 and 18 U.S.C. § 2255. K.C. proceeds by initials given the deeply personal and sensitive nature of these allegations, and moves contemporaneously for leave to proceed by pseudonym and for entry of a protective order.

**42.** Plaintiff M.S., at age 16, was introduced to her trafficker by a mutual friend on Facebook. This mutual friend was from the same town as M.S.; however, they had not met in person before the invited M.S. to a party. M.S. was taken to the trafficker's house, where a party was taking place, and M.S., along with other girls, was taken there. At the time, M.S. still resided at home. She would attend school and then go to the trafficker's house after school before returning home at night.

**43.** The trafficker, Jeremy Mack, went by the nickname "Mack." He was a white male in his mid-30s, approximately 5'8", with a shaved head and tattoos covering his body. He also had a Libra zodiac symbol tattooed on the back of his head. The trafficker's known associate was Ashley Onysko, a white female in her mid-to-late 20s. She had a heavy build and a round face. The Plaintiff believes she was groomed through Facebook by the trafficker through their mutual friend. The mutual friend was heavily involved with drugs, and the Plaintiff stated that the trafficker sent the mutual friend to find girls and bring them to him under false pretenses in exchange for drugs. The Plaintiff was under the impression that the trafficker was her boyfriend.

**44.** M.S. began being advertised on Backpage.com from February to April of 2013, when she was 16 years old. M.S., along with other girls who were over 18 and staying at the trafficker's house, was posted on Backpage.com. M.S. recalls that her Backpage.com name was Sunny or Sunni, although she is unsure of the spelling because she never saw the advertisements.

**45.** M.S. knew she was being advertised on Backpage.com because she, along with the other girls staying at the trafficker's house, was told that they had to take pictures for the Backpage

advertisement. M.S. wore black lingerie in the pictures that were taken of her. The pictures were taken at the trafficker's house, and the photographs of her in lingerie were used in the advertisements. M.S. recalls that both traffickers had multiple phones that were used to post advertisements on Backpage.com. She did not know the credentials or contact numbers used for the Backpage.com accounts, as the accounts belonged to the traffickers, Jeremy Mack and Ashley Onysko.

**46.** The primary location where, as a 16-year-old child, was trafficked was at Camelot Inn-Elyria, located at 550 Griswold Rd, Elyria, OH 44035, and the· Red Roof Inn & Suites Cleveland – Elyria, located at 621 Midway Blvd, Elyria, OH 44035.

**47.** The Backpage.com posts included the traffickers' contact information because they were responsible for setting up the appointments. M.S. never saw the advertisements and was not aware of how much the trafficker charged. M.S. was afraid to speak about what was happening because of threats that her family would be killed. Eventually, she told a close friend about the Backpage.com advertisement. The friend and her mother searched online and saw the advertisements.

**48.** Jeremy Mack and Ashley Onysko were both criminally prosecuted in the U.S. District Court, Northern District of Ohio (*USA v. Mack et al.*, Case No. 1:13-cr-00230). Both were convicted of trafficking, and Jeremy Mack is still in federal prison.

**49.** Plaintiff M.S. does not allege, and is not required to allege, that Salesforce knew of her individually, knew her name, or knew of the particular advertisements by which she was sold. *G.G.*, 76 F.4th at 558.

**50.** **Defendant Salesforce, Inc.** ("Salesforce") is a corporation organized under the laws of the State of Delaware with its principal place of business in San Francisco, California. Salesforce was formerly known as salesforce.com, inc., and changed its name during the pendency of the *G.G.* litigation. Salesforce is the world's leading provider of customer relationship management software. It is registered to transact business in Ohio and maintains a designated statutory agent in this District.

**51.** Salesforce is responsible under United States law and otherwise for the acts and omissions of its officers, directors, employees, and agents, including the acts and omissions described in this Complaint.

**BACKPAGE**

**52.** Backpage.com was created in 2004 by Michael Lacey and James Larkin, the owners of Village Voice Media Holdings—a newspaper chain whose publications were known for carrying advertisements for unlawful commercial sex on the "backpage" of newspapers. Carl Ferrer was a long-time employee who conceived of the site and later served as its chief executive officer.

**53.** In 2008, the leading online marketplace, Craigslist, took steps to reduce the volume of commercial-sex advertising on its platform. Backpage captured the displaced volume and entered a period of what the Senate later called "explosive growth."

**54.** Backpage's gross revenue grew rapidly, from $5.3 million in 2008, to $11.7 million in 2009, to $29 million in 2010. By the time of K.C.'s trafficking in 2014, Backpage's gross revenue had grown to $135 million. Its EBITDA margin—a measure of operating profitability—increased from 69% in 2011 to 82% in 2014. From January 2013 through May 2015, Backpage earned approximately $346 million in revenue, of which nearly $340 million came from online commercial sex.

**55.** Between 2008 and 2011, Backpage was publicly identified by law enforcement as the largest and most notorious sex-trafficking and prostitution-promoting website in the United States. By 2010 it was the unchallenged leader in online advertising for the trafficking and exploitation of women and children.

**56.** On August 31, 2011, the National Association of Attorneys General wrote to Backpage's owner demanding that it stop facilitating "the sexual exploitation of children" and describing Backpage as "a hub" of "human trafficking, especially the trafficking of minors." The letter received widespread national news coverage. A follow-up letter dated September 16, 2011, reflected the joinder of fifty-one attorneys general. Backpage refused to act.

**57.** In March 2012, Nicholas Kristof of the New York Times published "Financiers and Sex Trafficking," exposing the financial relationships that sustained Backpage, and "Where Pimps

Peddle Their Goods," which told the story of "Alissa," trafficked on Backpage at age sixteen: "You can't buy a child at Wal-Mart, can you? No, but you can go on Backpage and buy me on Backpage."

**58.** Salesforce's hometown newspaper, the San Francisco Chronicle, published no fewer than 400 articles about Backpage between 2009 and 2017, including articles in 2012 expressly linking Backpage to child sex trafficking. Newspapers in Dallas—Backpage's home city—published dozens more, as did news sources across the country.

**59.** While Salesforce continued to provide affirmative assistance and support to Backpage, Backpage was often in the national news. In July 2015, the major credit card companies refused to allow Backpage to utilize their cards. They discontinued work with Backpage for "moral, social, and legal" reasons.

**60.** In July 2015, Visa and MasterCard publicly severed their relationships with Backpage for "moral, social, and legal" reasons. Backpage responded by making its adult advertisements free using the promotional code "FREESPEECH."

**61.** In 2015 the Permanent Subcommittee on Investigations of the United States Senate Committee on Homeland Security and Governmental Affairs opened an investigation into Backpage. On March 17, 2016, the Senate held Backpage in contempt for refusing to comply with a congressional subpoena concerning sex trafficking on the site.

**62.** On October 6, 2016 (or alternatively, on October 8, 2016), Backpage's chief executive officer, Carl Ferrer, was charged with pimping a minor. The arrest was national news. The proceeding was a joint state and federal effort involving the United States Attorney, the Texas Attorney General, and the California Attorney General.

**63.** The charges were later dismissed, but the charge itself should have served as a clear warning to Salesforce that Backpage was involved in potential sex trafficking or the prostitution of children.

**64.** On January 10, 2017, the Senate Subcommittee released its report, *Backpage.com's Knowing Facilitation of Online Sex Trafficking*—a fifty-page report accompanied by an 839-page appendix—establishing that Backpage and its principals, owners, employees, and agents knew that

Backpage facilitated unlawful activity, including child sex trafficking. That same day, Backpage executives appeared before the Subcommittee and invoked the Fifth Amendment.

**65.** The Senate found that seventy-three percent of all suspected child sex-trafficking reports the National Center for Missing and Exploited Children received from the general public involved Backpage.

**66.** In March 2018, Congress enacted the Allow States and Victims to Fight Online Sex Trafficking Act, legislation aimed squarely at Backpage. On April 6, 2018, the Federal Bureau of Investigation and a multi-agency federal enforcement action seized and shut down Backpage.com.

**67.** In April 2018, Backpage pleaded guilty in Nueces County, Texas to one count of Trafficking of Persons, Tex. Penal Code § 20A.02, and one count of Engaging in Organized Criminal Activity, Tex. Penal Code § 71.02. As part of its plea, Backpage judicially confessed that it "did, on or about January 1, 2015, through March 31, 2015, in Nueces County, Texas, knowingly receive a benefit from participating in a venture that involved the trafficking of [a] child younger than 18 years of age." Backpage also entered a plea in the District of Arizona.

**68.** It is therefore judicially established that Backpage engaged in conduct violating both state and federal sex-trafficking statutes, including 18 U.S.C. § 1591. As the Seventh Circuit put it: "That Backpage committed multiple violations of Section 1591 is not in question." *G.G.*, 76 F.4th at 552–53.

**69.** Backpage was a criminal enterprise conducted in the open. Its nature was not a secret from anyone who read a newspaper. It was not a secret from Salesforce.

## SALESFORCE'S BUSINESS

**70.** Salesforce is the world's number one customer relationship management (CRM) company. CRM is a technology platform for managing a company's relationships and interactions with its customers and potential customers. Its purpose is to help a business stay connected to its customers, streamline its processes, and improve its profitability.

**71.** Salesforce also sells marketing software and tools designed to work with the CRM platform to enhance a customer's customer acquisition, customer communications, and sales.

**72.** Salesforce's software is designed and intended to enhance the efficiency and success of a business, but it must be conformed to the individual business to achieve that result. The design, implementation, and support of Salesforce's software is a complex endeavor configured to each customer's particular needs.

**73.** The essence of the Salesforce business model is both the technology offered and the affirmative support provided—both of which are designed to aid in the success of the customer's business. Salesforce's marketing materials have promised: "Your success is our success." And: "Get more than a CRM. Get a Strategic Partner."

**74.** The cornerstone of the Salesforce platform is the customer "org"—a portal serving as the continuing point of interaction between Salesforce and its customer, consisting of that customer's users, data, and automation. Each customer has a unique org. The customer org is confidential to the customer and is not accessible to the public.

**75.** Salesforce maintains its own internal instance, known internally as "Org 62," on which it keeps data about its customers and its own sales efforts, and to which only Salesforce has access. Salesforce's interactions with its customers are documented in Org 62 in the form of call logs, case notes, chats, and emails.

## THE SALESFORCE–BACKPAGE VENTURE: FOUR AND A HALF YEARS OF CULPABLE ASSISTANCE

### <u>2012–2013: Solicitation, courtship, and contract</u>

**76.** On July 9, 2012—nearly a year after fifty-one attorneys general had publicly denounced Backpage as a hub for the trafficking of minors—Dan Hyer of Backpage placed the first call to Salesforce. Salesforce employee Andrew Gillis was told at the outset that the prospective customer was Backpage.com and confirmed it.

**77.** Gillis followed up, repeatedly emphasizing the importance of understanding the customer to maximize the value of Salesforce's software. A second Salesforce employee emailed Backpage's chief executive officer, Carl Ferrer, that same day, inquiring about the company's

"business objectives." When Salesforce asked who the prospective customer was, Backpage told it. From the outset, Salesforce knew it was pursuing a deal with Backpage.com.

**78.** On July 26, 2012, Salesforce account executive Dana Mottet emailed Hyer to schedule a meeting "to learn more about your top business objectives for this project."

**79.** On October 29, 2013, Hyer called Salesforce again and spoke with employee Ibraheem Rakie. Backpage was again identified as the customer—not "Website Technologies." Backpage told Salesforce it "would like to see how easy it is to customize fields," needed "email through the system," and wanted to "customize the customer or account templates." Rakie documented a "converted lead." The account was originated in Org 62 as "Backpage.com LLC."

**80.** Salesforce assigned account executive Mark Raymo as its point of contact for Backpage. Raymo and "Dan Backpage" (dan@backpage.com) communicated regularly and developed a cordial relationship, joking about their travels.

**81.** Salesforce offered Backpage special financial incentives from the outset. Raymo wrote that he would "get as aggressive as I can" on pricing, and Salesforce worked to provide "additional discount points on the data storage."

**82.** Salesforce monitored the results of Backpage's board meetings, at which Backpage's business decisions were made.

**83.** The Backpage deal was escalated inside Salesforce. Raymo reported the transaction to Adam Johnson, Regional Manager for the Southern Region, and emailed news of it to Kevin Meagher, Vice President of Commercial Sales, noting: "we will need to offer some incentives to win this compete from Sugar. I wanted to socialize this with you, so we can begin the conversations up the ladder." Raymo told Backpage: "I'd love to connect. As you might imagine, my executive team is keen on receiving updates on this potential strategic partnership." Johnson wrote: "This deal is critical for November."

**84.** The first Salesforce contract for Backpage bore an order date of November 18, 2013, for 500MB of data storage and 56 licenses of Salesforce Enterprise Edition.

**85.** It was during this time when the name of the purchasing customer changed from Backpage.com LLC to "Website Technologies LLC," a shell entity created by Backpage's owners. Between November 25 and November 29, 2013, there were more than fifty communications about Backpage inside and outside Salesforce—internal emails, chats, emails with Backpage, and emails with Backpage principal Scott Spear—culminating in a signed contract on Friday, November 29, 2013.

**86.** Salesforce celebrated. It posted the transaction internally as a "Big Deal Alert." Raymo wrote: "Truly a team win on this one."

**87.** Upon information and belief, Website Technologies LLC entered into an initial Master Subscription Agreement with Salesforce in 2013; Website Technologies purchased subscriptions to Salesforce CRM software products under that agreement; and that the last such subscription expired in or around 2018.

## <u>2014: Configuration, customization, and access to Backpage's data</u>

**88.** Salesforce did not sell Backpage an off-the-shelf package and disappear. It provided ongoing, targeted support directed at the specific obstacles Backpage faced, stretching beyond routine technical assistance to active, tailored solutions as Backpage expanded its business.

**89.** On January 6, 2014, Salesforce account executive John Mark Nismal assisted Backpage employee Randlow Smith, who was unable to log in using Data Loader, Salesforce's bulk import and export application.

**90.** In February, Smith sought guidance on Salesforce's "Email Relaying Feature" and was advised that it would be activated by a Salesforce specialist. Backpage contacted Salesforce to enable Email Relay on its organization—a feature permitting Backpage to use multiple email domains when sending messages to the customers and prospective customers of Backpage.com and its affiliated commercial-sex sites.

**91.** In February 2014, another Salesforce account executive assisted Backpage with Apex triggers. Apex is the programming language integral to the Salesforce platform. Backpage could not use it effectively without help, and Salesforce supplied that help.

**92.** On March 21, 2014, Salesforce's sales team helped Backpage fix a problem with global search. On March 26, 2014, Salesforce's call log records that Salesforce "[a]dvised we reopen the case and request to grant us login access to their Org."

**93.** Salesforce employee John Noel Zabala offered to troubleshoot for Backpage and requested access to the Backpage org. Backpage granted it.

**94.** On April 11, 2014, Salesforce employee Kripa Kripanandan worked with Dan Hyer on sidebar searches. Salesforce again requested and was granted access to the Backpage org.

**95.** Salesforce explained to Backpage how it could "develop custom code and use SOQL to execute a wildcard search," supplied an example, and offered "more options for you to consider that will not require any development work."

**96.** On June 18, 2014, Backpage employee Patrick Conner contacted Salesforce for help with formula fields. Salesforce responded: "For me to be able to give a good recommendation please allow me to see and check this field. Kindly provide me with a grant log in access." Conner granted access to the database.

**97.** Salesforce's records identify at least 182 documented communications between Salesforce and Backpage across three Org 62 logs alone, beginning on November 29, 2013 and continuing through October 16, 2017.

**98.** Salesforce affirmatively reached out to Backpage as well -- following up on technical issues, notifying Backpage when software versions changed, and pressing for additional business. Salesforce employees continued to identify the customer internally as Backpage, including by displaying the Backpage "bp" logo on their account records.

**99.** In 2014, Salesforce regional sales manager Adam Johnson discussed with Backpage the use of Salesforce "investment funds" to subsidize Backpage's purchase of Salesforce technology, enlisting Area Vice President Kevin Meagher in the effort.

**<u>2015: Marketing and Growth for Backpage</u>**

**100.** In early 2015, Salesforce account executive Kelly Goyette wrote to Backpage about marketing and mass mailings. Goyette was "doing some research" for Backpage and inquired about its plans for "email/marketing communications," including "drip campaigns"—automated sequences of marketing messages sent to subscribers over time.

**101.** Backpage was pleased. It contacted Salesforce Regional Vice President Joe Curtis to praise Goyette for the "thoughtful solutions" she developed to problems Backpage faced and for her understanding of Backpage's "growth related needs."

**102.** On June 3, 2015, Salesforce employee Nathan Snyder spoke with Patrick Conner of Backpage. Backpage provided an update on its business and its goals—among them, hiring employees in Amsterdam and running drip marketing campaigns. Salesforce's notes of that call record discussion of Salesforce best practices, process builder (business-process automation), workflow time triggers, drip campaigns, automating contact with low-priority prospects, following up after contact, and duplicate management for custom objects.

**103.** That single call reflects what the relationship had become: Salesforce assessing Backpage's business objectives and designing solutions to advance them.

**104.** On August 11, 2015—a month after Visa and MasterCard publicly cut ties with Backpage over trafficking concerns—Salesforce "sales leader" Shahbaaz Kara-Virani emailed Backpage's chief executive Carl Ferrer to solicit additional business, echoing the pitch that brought the two companies together: "find more customers... win more business and ultimately keep customers happy."

**105.** On November 23, 2015, Backpage renewed its Salesforce contract for another year. The order was signed by Carl Ferrer, chief executive officer.

**<u>2016: Backpage's CEO is Charged with Child Sex Trafficking, but Salesforce Renews the Contract Anyway</u>**

**106.** In February 2016, Salesforce account executive Dustin Kolo introduced Backpage to its new account executive, Charlie Sonnenberg. Patrick Conner reported to Salesforce on the "tumultuous year" Backpage had endured—the loss of its payment processors, the Senate investigation, and its efforts to move operations out of the United States.

**107.** On February 26, 2016, Sonnenberg called Conner and took detailed notes. Those notes record that Salesforce learned and documented: that Backpage's revenues grew twenty percent per year after Craigslist stopped carrying adult ads in 2010; that Backpage "[h]ad to scale back this past year due to regulations"; that Backpage had an office in Amsterdam with dozens of sales representatives around the world; that Backpage used Salesforce for its sales team, record storage, auditing, and SMS text-message contacts; that Backpage wanted to run drip campaigns to increase business; and that Backpage "[h]ad to cut off payment processors"; and that Backpage had made all of its advertisements free as a result. Sonnenberg closed with an invitation to "lunch or drinks." His notes are captioned to both "Website Technologies" and "bp."

**108.** On March 16, 2016, Sonnenberg wrote to Conner that he was excited to hear about Backpage's "growth plans" and that Salesforce wanted "to do whatever we can to help you all get there!" The next day, the United States Senate held Backpage in contempt for refusing to produce documents about sex trafficking on its site.

**109.** In 2016, Backpage undertook to move its operations from Dallas to Amsterdam and to create a second, separate "Org" in the Netherlands to hold its customer data—an arrangement that would allow Backpage to continue operating beyond the reach of United States law enforcement. Backpage could not accomplish the migration on its own and had no third-party implementation partner. It asked Salesforce.

**110.** Sonnenberg assisted, and enlisted a Salesforce Solution Engineer, Matthew Kramer, to help with the data migration. As the Seventh Circuit summarized the allegations, when Backpage "faced imminent seizure by the United States government and wanted to 'establish and maintain a duplicate copy of the Backpage operations system and platform' so that it could 'move and operate its business overseas,' Salesforce 'facilitated this system reorganization and provided the technical infrastructure' to do so." *G.G.*, 76 F.4th at 550.

**111.** On July 28, 2016, Sonnenberg called Conner for an account review and invited him to dinner; they discussed a meeting with Dan Hyer and Carl Ferrer.

**112.** In August 2016, a Salesforce Senior Success Manager, Ben Heitlinger, contacted Backpage to offer a "Business Review"—Salesforce's assessment of a customer's operational

needs. On September 13, 2016 he followed up, telling Backpage the review would help it gain "an understanding of other areas of the system that you can leverage to your advantage." Conner responded the next day.

**113.** In September 2016, Sonnenberg spoke with Conner about Backpage's need for additional licenses. Backpage proposed to pay in bitcoin. Salesforce accommodated.

**114.** Heitlinger followed up on October 18 and October 27, 2016, but no business review occurred. After Heitlinger "synced up" with Sonnenberg, Heitlinger withdrew the request for a meeting. Salesforce and Sonnenberg apparently were concerned about the legal problems of Backpage and postponed the "business review."

**115.** On October 8, 2016, Carl Ferrer—Backpage's chief executive officer and Salesforce's contract signatory—was charged with pimping a minor.

**116.** A month later on November 11, 2016, Sonnenberg called Conner for a "renewals discussion," learning the current status of Backpage's operations, its need for additional licenses, and the opening of its Amsterdam office. Just weeks after Carl Ferrer was arrested for child sex trafficking, he signed another Salesforce contract renewal.

**2017: Salesforce Agrees to Help Backpage Relocate to the Netherlands to Avoid U.S. Laws, Providing at Least Some Services at "Zero Cost"**

**117.** On January 10, 2017, the Senate published its report finding that Backpage knowingly facilitated online sex trafficking, including child sex trafficking, and Backpage's executives invoked the Fifth Amendment before the Subcommittee.

**118.** Sixteen days later, on January 26, 2017, Salesforce account executive Riley Humes called Patrick Conner five times. Salesforce's notes of the longest of those calls record that Backpage was using the Salesforce platform for marketing—"[t]he main goal is email marketing"—and wanted to add "nurture tracks," "follow up tracks," and "custom tracks based on transaction."

**119.** That same day, Sonnenberg conducted a multi-page internal chat about Backpage with Salesforce Pardot marketing specialist Peter Kim.

**120.** The next day, January 27, 2017, Salesforce sold Backpage Pardot, an advanced marketing automation product, and agreed to have Salesforce's Pardot implementation team work with Backpage "to make sure you all get up and running quickly."

**121.** Backpage had never hired a third-party implementer to configure its Salesforce software. When Backpage struggled to implement Pardot, Salesforce paid for a third-party implementer—EBQ—to work for Backpage and automate its contacts in Pardot.

**122.** In February 2017, Sonnenberg briefed the incoming account executive, Michael McLaughlin, on Backpage as a customer.

**123.** In March 2017, Conner told Salesforce that Backpage faced "external factors" that had affected its budget. The external factors were the federal investigation of Backpage and the arrest of its chief executive on child sex-trafficking charges. Salesforce took no action and continued to work with Backpage.

**124.** Backpage had approximately 6.5 million users, many of them stale. Backpage wanted to identify users who had recently purchased advertising on Backpage.com and import only those users into Pardot. It asked Salesforce how to configure the software to do it.

**125.** McLaughlin told Conner he had "my team looking into automation of leads." He enlisted a Salesforce Pardot specialist, Melloh, and other internal resources, recording: "Red Flags: We need to confirm ability to send contacts, based on custom criteria, automatically to Pardot. We have found a solution for this and are communicating with the customer and the partner."

**126.** In April 2017, Backpage moved to create a separate European org and to place its United States data "in cold storage." McLaughlin was aware Backpage was moving personnel to Amsterdam and that Backpage sought an "EU Instance." Salesforce answered Backpage's questions about how to "migrate metadata" as part of the org cloning. The European org was to be managed by Ad Tech BV, another shell entity created by Backpage's owners.

**127.** Salesforce Solution Engineers Matt Rash and Daniel Sienkiewicz conducted a lengthy exchange with Conner about constructing a program to filter queries about Backpage's customers and purge stale users from its system.

**128.** When a Salesforce engineer asked about next steps and whether Backpage might engage an outside consultant, Rash answered: **"Given the nature of their business, I'm not sure they would engage a partner."**

**129.** On September 19, 2017, Rash and Conner spoke again about Backpage's plan to operate two orgs. Salesforce accommodated Backpage's request that the work be performed at "zero cost."

**130.** Salesforce personnel also assisted Backpage in extending the default email archive period on the platform from 365 days to 1,825 days, so that Backpage could retain contact with its customers over a period of five years.

**131.** Salesforce and Backpage conducted online meetings and screen-sharing sessions—"to record the behavior you are seeing and to ensure we are on the same page"—that permitted Salesforce personnel to observe Backpage's org and the problems Backpage was encountering directly.

**2018: Congress Passes FOSTA and the FBI Seizes Backpage**

**132.** In March 2018, as Congress moved on legislation aimed at Backpage, Salesforce account executive Dowell Ginsburg fielded Backpage's questions about the security of the Salesforce platform and Backpage's concern that the data it maintained there could be obtained by law enforcement.

**133.** Ginsburg invited Conner to lunch and followed up on the outcome of the legislation. The day after it passed the Senate, Ginsburg and Conner exchanged reflections on it, and Ginsburg continued to press for a meeting and to pursue Backpage's continued business.

**134.** Two weeks later, on April 6, 2018, the Federal Bureau of Investigation seized Backpage.com.

## SALESFORCE PARTICIPATED IN BACKPAGE'S VENTURE

**135.** Salesforce was not a remote intermediary indifferent to the content of what it transmitted. It was a contractual partner actively invested in Backpage's success for four and a half years.

**136.** Backpage sought out Salesforce because it needed a partner who could facilitate and support its exponential growth. Salesforce accepted that role, entered into a series of lucrative contracts to fill it, and performed it.

**137.** Over the life of the relationship, Salesforce:

a. assigned a succession of dedicated account executives to Backpage—Mark Raymo, Kelly Goyette, Dustin Kolo, Charlie Sonnenberg, Riley Humes, Michael McLaughlin, and Jason Ginsburg;

b. escalated the Backpage relationship to regional managers, regional and area vice presidents, and a vice president of commercial sales;

c. supplied solution engineers, Pardot specialists, success managers, and internal engineering teams to solve Backpage's problems;

d. repeatedly initiated contact with Backpage to assess its "business objectives," its "operational needs," and its "growth plans," and offered formal "Business Reviews" for that purpose;

e. designed and delivered targeted solutions addressed to specific obstacles Backpage identified;

f. requested, received, and used login credentials to Backpage's confidential customer org on multiple occasions;

g. offered Backpage discounts, subsidized pricing, "investment funds," and services at "zero cost";

h. sold Backpage additional products, including the Pardot marketing automation platform, and then paid a third-party implementer to configure that product for Backpage when Backpage could not;

i. helped Backpage build, automate, and operate the marketing and customer-communication apparatus by which Backpage acquired, retained, and monetized the customers who purchased its advertisements, including through drip campaigns, nurture tracks, lead automation, and mass email sent through Salesforce instances; and

j. helped Backpage clone its org, migrate its data to the Netherlands, and place its United States data in cold storage so that it could continue operating overseas.

**138.** With that assistance, Backpage collected detailed customer data on millions of users, streamlined its communications and business practices, scaled its operations, and grew its revenue. Salesforce's records reflect Backpage's use of Salesforce instances to manage and message hundreds of thousands of Backpage users, and hundreds of thousands more users of Cracker.com, an affiliated commercial-sex site owned by Backpage's principals.

**139.** Backpage was transformed, in the Seventh Circuit's words, from a "small… company with a handful of employees to an international powerhouse with over 250 employees spanning three continents." *G.G.*, 76 F.4th at 550.

**140.** This was not "the kind of routine sales of off-the-shelf products or standard services" that fall outside § 1595. *G.G.*, 76 F.4th at 562. It was "a direct, prolonged, and supportive contractual relationship"—"the active participation of a contractual partner." *Id.* at 561, 563.

**141.** Salesforce's assistance constitutes "culpable assistance to a wrongdoer" reflecting "a desire to promote the wrongful venture's success," and is established in any event by the "continuous business relationship" between Salesforce and Backpage. *G.G.*, 76 F.4th at 559.

## SALESFORCE KNEW OR SHOULD HAVE KNOWN

**142.** Constructive knowledge under § 1595 is a negligence standard. *G.G.*, 76 F.4th at 555 n.9. Salesforce satisfies it many times over.

**143.** **Public information.** Before Salesforce ever contracted with Backpage, Backpage had been publicly identified by law enforcement as the largest sex-trafficking website in the United States; fifty-one attorneys general had publicly demanded that it stop facilitating "the trafficking of minors"; the New York Times had published the account of a sixteen-year-old sold on the site; and Salesforce's own hometown newspaper had published hundreds of articles about Backpage, including articles expressly linking it to child sex trafficking. During the relationship, the credit-card networks cut Backpage off, the Senate investigated, held Backpage in contempt, and published its findings; Backpage's chief executive was charged with pimping a minor; Backpage's executives

took the Fifth; and Congress legislated against it by name. "These facts about its customer should have been known to Salesforce." *G.G.*, 76 F.4th at 555.

**144. Salesforce's own records.** Salesforce did not merely have access to this information; its personnel discussed it. Salesforce's notes record Backpage's account of a "tumultuous year," its loss of payment processors, its need to "scale back this past year due to regulations," and its plan to move offshore. Salesforce personnel discussed Backpage's legal exposure internally. A Salesforce account executive briefed his successor on the account. A Salesforce success manager withdrew a scheduled business review after conferring with the account executive. A Salesforce solution engineer wrote that "[g]iven the nature of their business," Backpage would likely not engage an outside partner. A Salesforce account executive fielded Backpage's questions about whether law enforcement could obtain the data it stored on Salesforce's platform.

**145. The relationship itself.** Independent of public reporting, constructive knowledge "may be reasonably inferred from the allegations that Salesforce repeatedly consulted with Backpage 'to assess its operational needs,' designed 'targeted solutions addressed to' those needs, and provided active, 'tailored,' and ongoing support as Backpage worked to expand its business and scale its operations." *G.G.*, 76 F.4th at 556. Salesforce did each of those things, for four and a half years.

**146. Access to Backpage's data.** Salesforce requested and received credentials to Backpage's confidential customer org on multiple documented occasions and conducted screen-sharing sessions in which Salesforce personnel observed Backpage's system directly. What Salesforce saw in that data is a matter for discovery.

**147.** Salesforce at least should have known that Backpage's venture had violated and was continuing to violate 18 U.S.C. § 1591, including through the trafficking of minors.

## SALESFORCE KNOWINGLY BENEFITED

**148.** Upon belief, Salesforce and Backpage entered into a Master Subscription Agreement in 2013 and multiple renewals and additional purchases thereafter, the last of which expired in 2018.

**149.** Salesforce received payments in connection with those subscriptions. Salesforce earned $1,469,846.02 from the Backpage relationship.

**150.** Salesforce also benefited by treating Backpage as a strategic account—celebrating the transaction internally as a "Big Deal Alert," escalating it to executive management, and pursuing renewals and upsells for four and a half years.

**151.** Salesforce was aware that it was benefiting from its participation in the venture. That is all § 1595 requires. *G.G.*, 76 F.4th at 564–65.

**152.** In 2019, an Assistant United States Attorney for the Northern District of California made inquiry of Salesforce regarding its relationship with Backpage. Salesforce's counsel met with that attorney and made a presentation.

## PLAINTIFFS ARE SOME OF MANY VICTIMS OF THE SALESFORCE–BACKPAGE VENTURE

**153.** Backpage had approximately 6.5 million users. Its adult advertising section generated more than ninety-nine percent of its revenue between 2013 and 2015. Seventy-three percent of suspected child sex-trafficking reports made to the National Center for Missing and Exploited Children by the public involved Backpage.

**154.** It is more likely than not that any given individual advertised for commercial sex on Backpage.com was a person compelled to perform commercial sex acts—either as a minor, or as an adult subjected to force, fraud, or coercion. That was the nature of Backpage's business.

**155.** Plaintiffs are some of thousands of people advertised for commercial sex on Backpage.com during the period Salesforce was helping Backpage grow.

**156.** Plaintiffs were victims of a criminal violation of 18 U.S.C. § 1591 at the hands of her trafficker and of Backpage. They were all under the age of eighteen at the time. They were caused to engage in commercial sex acts by means of force, fraud, and coercion, and they were all minors—either of which independently satisfies § 1591.

**157.** As a direct and proximate result, Plaintiffs have suffered and continues to suffer severe and permanent psychological, emotional, physical, educational, and financial injury.

## CLASS ACTION ALLEGATIONS

**The Class and the Minor Subclass**

**158.** Plaintiffs, are members of, and bring this action under Federal Rule of Civil Procedure 23 on behalf of herself and the following Class and Subclass:

> ***The Class.*** *All persons who (a) were victims of a violation of 18 U.S.C. § 1591—that is, who were caused to engage in a commercial sex act by means of force, threats of force, fraud, or coercion, or who had not attained the age of eighteen years at the time—and (b) who were advertised, offered, solicited, or otherwise held out for commercial sex on Backpage.com or any website owned or operated by Backpage.com LLC or its principals, including Cracker.com, (c) at any time between November 18, 2013 and April 6, 2018, inclusive.*
>
> Plaintiffs also bring this action on behalf of the following Subclass:
>
> ***The Minor Subclass.*** *All members of the Class who had not attained the age of eighteen years at the time they were advertised, offered, solicited, or otherwise held out for commercial sex on Backpage.com or any website owned or operated by Backpage.com LLC or its principals.*

**Exclusions**

**159.** Excluded from the Class and the Minor Subclass is any person who is the claimant-victim in a criminal action that is presently pending and that arises out of the same occurrence as that person's claim in this action, including without limitation any person whose trafficker—where that trafficker used Backpage.com to advertise, offer, or solicit that person for commercial sex—is presently the subject of a pending criminal prosecution arising out of that trafficking. This exclusion is drawn to correspond to 18 U.S.C. § 1595(b)(1).

**160.** Also excluded from the Class and the Minor Subclass are: (a) any judge or magistrate judge presiding over this action and members of their families; (b) Salesforce, its subsidiaries, parents, successors, predecessors, and any entity in which Salesforce has a controlling interest, and its current and former employees, officers, and directors; (c) counsel for Plaintiffs and for Salesforce and the employees of their firms; and (d) the legal representatives, successors, heirs, and assigns of any excluded person.

**161.** Plaintiffs reserve the right to modify, amend, or refine the Class and Minor Subclass definitions, including to add or adjust subclasses, after discovery and before moving for class certification.

**Rule 23(a)**

**162. Numerosity—Rule 23(a)(1).** The members of the Class and Minor Subclass are so numerous that joinder of all members is impracticable. Backpage had approximately 6.5 million users and derived more than ninety-nine percent of its revenue from adult advertising during the relevant period. The Senate found that seventy-three percent of suspected child sex-trafficking reports received by NCMEC from the public involved Backpage. The membership of the Class is likely in the thousands and the membership of the Minor Subclass is likely in the hundreds or thousands. Members may be identified through Salesforce's records, records obtained from the government's seizure and prosecution of Backpage, records held by NCMEC and law-enforcement agencies, and other discovery.

**163. Commonality—Rule 23(a)(2).** Questions of law and fact common to the Class and Minor Subclass exist. Because § 1595 liability turns on the defendant's relationship to the *venture* rather than to any individual victim, *G.G.*, 76 F.4th at 558, the operative questions are common to every member and do not vary from person to person. They include:

a. whether Backpage's business constituted a "venture" within the meaning of 18 U.S.C. § 1595(a);

b. whether that venture engaged in acts in violation of 18 U.S.C. § 1591;

c. whether Salesforce participated in that venture within the meaning of § 1595(a);

d. whether Salesforce knew or should have known that the venture had engaged in acts in violation of § 1591;

e. whether Salesforce knowingly benefited, financially or by receiving anything of value, from its participation in that venture;

f. whether Salesforce's conduct satisfies the elements of 18 U.S.C. § 1591(a)(2) so as to constitute a predicate violation under 18 U.S.C. § 2255;

g. whether Salesforce's conduct was a proximate cause of injury to the Class and Minor Subclass;

h. whether members of the Minor Subclass are entitled to liquidated damages of $150,000 each under 18 U.S.C. § 2255(a); and

i. whether Plaintiffs and the members are entitled to punitive damages, restitution, disgorgement, attorneys' fees, and costs.

**164. Typicality—Rule 23(a)(3).** Plaintiffs' claims are typical of the claims of the members she seeks to represent. Plaintiffs and every member were injured by the same course of conduct by the same defendant: Salesforce's knowing benefit from, and participation in, the Backpage venture, which Salesforce knew or should have known had violated § 1591. Plaintiffs' claims arise from the same legal theories and the same body of proof as those of the members.

**165. Adequacy—Rule 23(a)(4).** Plaintiffs will fairly and adequately protect the interests of the Class and Minor Subclass. Plaintiffs have no interests antagonistic to those of the members. Plaintiffs have retained counsel experienced in complex class litigation and in TVPRA litigation, who will vigorously prosecute this action.

**Rule 23(b)(3)**

**166.** This action is maintainable under Rule 23(b)(3).

**167. Predominance.** Every element of Salesforce's liability is common. Whether Backpage's business was a venture that violated § 1591, whether Salesforce participated in it, whether Salesforce knew or should have known of the venture's violations, and whether Salesforce knowingly benefited are questions answered by the same evidence—Salesforce's own contracts, communications, call logs, account records, and internal chats—for every member of the Class. Because § 1595 does not require knowledge of the specific victim, *G.G.*, 76 F.4th at 558, there is no victim-specific liability inquiry to defeat predominance. The individual issues that remain—each member's status as a victim of a § 1591 violation and the amount of each member's damages—are secondary and administrable.

**168. Predominance as to the Minor Subclass.** Predominance is stronger still for the Minor Subclass. CAVRA permits each victim to elect liquidated damages of $150,000 in lieu of actual damages. 18 U.S.C. § 2255(a). That election renders damages susceptible to common, class-wide proof and eliminates the principal source of individual variation.

**169. Superiority.** A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The members are dispersed across the country. Many were

children when they were harmed and are unlikely to identify, retain counsel for, and individually litigate a claim against a defendant of Salesforce's resources. Individual litigation would require every plaintiff to reconstruct, at enormous expense, the same four-and-a-half-year documentary record of Salesforce's conduct—a record that has already consumed six years of discovery in a single case. Individual litigation risks inconsistent adjudications of Salesforce's conduct. Concentrating the litigation in one forum conserves judicial resources and the parties' resources, and no unusual difficulties are presented in managing this action as a class action.

**170.** Members' claims may be proved through Salesforce's records, Backpage records seized by the government, law-enforcement and NCMEC records, and a claims-administration process capable of verifying victim status and minority.

**Rule 23(c)(4)**

**171.** In the alternative, and in addition, Plaintiffs seeks certification under Rule 23(c)(4) of the following particular issues, each of which is common, dispositive of a necessary element of liability, and appropriate for one-time class-wide resolution:

a. whether Backpage's business constituted a venture that engaged in acts in violation of 18 U.S.C. § 1591;

b. whether Salesforce participated in that venture within the meaning of 18 U.S.C. § 1595(a);

c. whether Salesforce knew or should have known that the venture had engaged in acts in violation of 18 U.S.C. § 1591; and,

d. whether Salesforce knowingly benefited from its participation in that venture.

**172.** Resolution of these issues would materially advance the disposition of every member's claim and would leave for individual proceedings only victim status and damages.

**COUNT I:**

**Violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595**

**(On Behalf of Plaintiffs and the Class)**

**173.** Plaintiffs incorporate each preceding paragraph as if fully set forth herein and brings this Count on behalf of herself and the Class.

**174.** Plaintiffs and each member of the Class are victims of a violation of 18 U.S.C. § 1591 and are entitled to bring a civil action under 18 U.S.C. § 1595(a).

**175. Salesforce knowingly benefited.** Salesforce received $1,469,846.02 and other things of value from its participation in the venture and was at all times aware that it was benefiting from that participation.

**176. Salesforce participated in the venture.** Backpage's business—including its growth, expansion, and profitability—was a venture within the meaning of § 1595(a). *G.G.*, 76 F.4th at 554. Salesforce assisted, supported, and facilitated Backpage's venture through a direct, prolonged, and supportive contractual relationship spanning four and a half years, in which Salesforce assessed Backpage's operational needs, designed targeted solutions addressed to those needs, provided active, tailored, and ongoing support, accessed Backpage's confidential customer data, built and automated Backpage's marketing apparatus, and facilitated Backpage's relocation of its operations and data overseas. This is participation within the meaning of § 1595(a).

**177. The venture engaged in acts in violation of § 1591.** The venture repeatedly violated 18 U.S.C. § 1591(a)(1) and (a)(2) by advertising, maintaining, and profiting from the advertisement of persons, including minors and persons subjected to force, fraud, and coercion, for commercial sex. Backpage knowingly receiving a benefit from participating in a venture involving the trafficking of a child under eighteen.

**178. Salesforce knew or should have known.** For the reasons set out above, Salesforce at least should have known—under the negligence standard that governs § 1595, that Backpage's venture had engaged in and was continuing to engage in acts in violation of § 1591, including the sex trafficking of children. Knowledge of any particular victim is not required.

**179.** Section 230 of the Communications Decency Act does not apply to Salesforce's conduct. Salesforce is not being sued as the publisher or speaker of any information provided by

another information content provider. It is being sued for its own conduct as a participant in a venture.

**180.** Salesforce's acts and omissions were a but-for and proximate cause of the injuries suffered by Plaintiffs and the Class.

**181.** As a direct and proximate result, Plaintiffs and the Class have suffered and continue to suffer severe and permanent psychological, emotional, physical, educational, and financial injuries, and are entitled to damages, restitution, disgorgement, punitive damages, and reasonable attorneys' fees as provided by 18 U.S.C. § 1595 and as otherwise available at law or in equity.

**COUNT II:**

**Violation of the Child Abuse Victims' Rights Act, 18 U.S.C. § 2255 ("CAVRA")**

**(On Behalf of Plaintiffs and the Minor Subclass)**

**182.** Plaintiffs incorporate each preceding paragraph as if fully set forth herein and brings this Count on behalf of herself and the Minor Subclass.

**183.** Plaintiffs and each member of the Minor Subclass had not attained the age of eighteen years at the time they were advertised, offered, solicited, or held out for commercial sex on Backpage.com, and each was a victim of a violation of 18 U.S.C. § 1591, an offense enumerated in 18 U.S.C. § 2255(a).

**184.** **Salesforce violated 18 U.S.C. § 1591(a)(2), an enumerated predicate offense.** Salesforce knowingly benefited, financially and by receiving things of value, from participation in a venture—Backpage's business—which had engaged in acts described in 18 U.S.C. § 1591(a)(1), namely the advertising, maintaining, and soliciting of persons who had not attained the age of eighteen years to engage in commercial sex acts.

**185.** Salesforce did so knowing, and in reckless disregard of the fact, that persons who had not attained the age of eighteen years were being and would be caused to engage in commercial sex acts through Backpage's venture. Salesforce's reckless disregard is established by, among other things:

a. its knowledge, before it ever contracted with Backpage, that fifty-one state attorneys general had publicly identified Backpage as a hub of "human trafficking, especially the trafficking of minors," and had demanded that it stop facilitating "the sexual exploitation of children";

b. its knowledge of national reporting, including in its own hometown newspaper and in the New York Times, expressly linking Backpage to the sex trafficking of children, including the published account of a sixteen-year-old sold on the site;

c. its knowledge that the United States Senate had opened an investigation into Backpage's facilitation of child sex trafficking, had held Backpage in contempt, and had published findings that Backpage knowingly facilitated child sex trafficking—after which Salesforce sold Backpage additional marketing software and paid a third-party implementer to configure it;

d. its knowledge that Backpage's chief executive officer had been criminally charged with pimping a minor—after which Salesforce accepted that same executive's signature on a contract renewal;

e. its own personnel's internal recognition of "the nature of [Backpage's] business," their discussions of Backpage's legal exposure, and their handling of Backpage's inquiries about whether law enforcement could obtain the data Backpage stored on Salesforce's platform;

f. its repeated, requested, and granted access to Backpage's confidential customer org and its screen-sharing sessions observing Backpage's system; and

g. the nature, duration, and intimacy of its relationship with the venture, in which Salesforce affirmatively and repeatedly assessed Backpage's business objectives and designed targeted solutions to advance them.

**186.** Salesforce's assistance was directed at, and materially advanced, the very functions of Backpage's venture through which minors were advertised and sold: customer acquisition, customer data management, marketing automation, mass communication with the purchasers of advertisements, and the preservation and relocation of the venture's operational infrastructure.

**187.** Plaintiffs and the members of the Minor Subclass suffered personal injury as a result of that violation within the meaning of 18 U.S.C. § 2255(a).

**188.** Plaintiffs and each member of the Minor Subclass are entitled to recover their actual damages or, at their election, liquidated damages in the amount of $150,000 each, together with the cost of the action, reasonable attorneys' fees, other litigation costs reasonably incurred, punitive damages, and such other preliminary and equitable relief as the Court determines to be appropriate. 18 U.S.C. § 2255(a).

**DAMAGES**

**189.** Plaintiffs incorporates each preceding paragraph as if fully set forth herein.

**190.** Plaintiffs and the members of the Class and Minor Subclass seek all damages recoverable under law, including:

a. liquidated damages of $150,000 per member of the Minor Subclass under 18 U.S.C. § 2255(a);

b. restitution, disgorgement of profits, and unjust enrichment;

c. exemplary and punitive damages;

d. reasonable attorneys' fees, expenses, and costs under 18 U.S.C. §§ 1595(a) and 2255(a); and

e. pre-judgment and post-judgment interest at the highest rate allowed by law.

**191.** Punitive damages are warranted. Salesforce worked with Backpage for four and a half years, month after month, through a public record of criminal sex trafficking that would have stopped any responsible company. It had repeated, obvious, and easy opportunities to end the relationship. It never took one. Its conduct evidences deliberate indifference and a willingness to bury its head in the sand. *See G.G.*, 76 F.4th at 557.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment in their favor and against Salesforce and grant the following relief:

a. An order certifying this action as a class action under Federal Rule of Civil Procedure 23(b)(3) and, in the alternative or in addition, certifying the

issues identified above under Rule 23(c)(4); appointing Plaintiffs as Class Representative; and appointing the undersigned as Class Counsel;

b. An award of liquidated damages of $150,000 per member of the Minor Subclass under 18 U.S.C. § 2255(a), in amounts to be proven at trial;

c. An award of punitive damages as permitted by law;

d. Restitution and disgorgement of the revenues and profits Salesforce obtained from its participation in the Backpage venture;

e. Declaratory relief establishing that Salesforce knowingly benefited from participation in a venture that it knew or should have known engaged in acts in violation of 18 U.S.C. § 1591;

f. Reasonable attorneys' fees, expenses, and costs as provided by 18 U.S.C. §§ 1595(a) and 2255(a);

g. Pre-judgment and post-judgment interest to the extent permitted by law; and

h. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demands a trial by jury on all claims and issues so triable.

POTTER HANDY LLP

Dated: November 24, 2026 By: /s/ James M. Treglio

James M. Treglio, Esq.
Attorneys for Plaintiffs and the Class